Joseph P. REGO, Cecile Rego, et al.,
Appellants,

v.

Robert L. DECKER, Appellee.

No. 1128.

Supreme Court of Alaska.

March 19, 1971.

Richard R. Cole, Fairbanks, for appellants.

Lloyd Hoppner and James R. Blair of Rice, Hoppner, Blair & McShea, Fairbanks, for appellee.

Before BONEY, C. J., DIMOND, RABINOWITZ, and CONNOR, JJ., and STEWART, Superior Court Judge.

RABINOWITZ, Justice.

Appellant Joseph Rego and his wife leased land with a three bay service station on it to appellee Robert Decker for one year, 1966. The rent was to be $65 per month, plus 2 cents per gallon on all gasoline sold in excess of 4,000 gallons per month and "a sum equal to the net profit realized from the sale of diesel fuel." The Regos agreed in part to pave the grounds with asphalt before July 31, 1966. Under the lease Decker was given an option to renew for four years on the same terms except that the minimum rent was to be increased to $125 per month during 1969 and 1970. The lease also included an option to purchase provision which provided:

> The lessors shall grant the lessee the firm option to purchase the leased premises, upon the giving of thirty days written notice of the exercise of the option by certified mail, at any time during the term of this lease or the renewed term thereof. Upon the lessee's exercise of his option to purchase, the terms of the transaction shall be as follows:
>
> A. The purchase price of the premises shall be Eighty-One Thousand ($81,000.00) Dollars.
>
> B. If lessee exercises his option to purchase within the term of this lease, the amount of all rents paid to the lessors shall be deducted from the purchase price. If the lessee exercises his

option to purchase within the first two years of the renewed lease term seventy-five (75%) percent of all rents paid to the lessors shall be deducted from the purchase price. If the lessee exercises his option to purchase within the last two years of the renewed lease term, fifty (50%) percent of all rents paid to the lessors shall be deducted from the purchase price. The terms for payment of the remaining balance due on the purchase price in the event the lessee exercises his option to so purchase shall be identical to the terms hereinbefore set forth as rent herein.

C. The lessors shall furnish the lessee with a Warranty Deed to the property. The lessors shall also furnish the lessee with a title insurance policy for the amount of the purchase price subject to no exceptions other than deed restrictions, easements and patent reservations of record.

D. The parties shall have the right to terminate this lease, or any renewal thereof, at any time upon the giving of thirty (30) days written notice by certified mail. Provided, however, any options in existence on the effective date of such termination may be exercised in the manner herein provided for a period of ninety (90) days following said effective termination date.

The Regos never paved the grounds of the service station. Prior to the expiration of the initial one-year period of the lease, Decker renewed the same for a four-year period. In February of 1967, Decker notified the Regos that he was exercising his option to purchase the property, and demanded a warranty deed and title insurance policy within 30 days. The Regos did not comply with Decker's demand, and conveyed the property instead to others, who took with notice of Decker's interest. Decker sued the Regos and their grantees for specific performance by the Regos of their obligations under the option to purchase provisions of the lease, damages flowing from the Regos' failure to pave the premises and other relief. After trial to the superior court without a jury, judgment was entered ordering the Regos to execute and deliver a warranty deed to Decker, declaring that Decker would, in the event the Regos refused to convey to Decker, have title to the property not subject to any interest of the Regos or their grantees, and ordering the Regos to deliver to Decker an $81,000 title insurance policy on the property. The Regos were also ordered to pave the premises with an asphalt covering by July 15, 1969, or Decker was to have judgment for $15,000. From this judgment the Regos appeal. They argue that specific performance should have been denied because the terms of the option provisions of the lease were uncertain and too harsh, or in the alternative, that if granted, the specific performance provisions of the decree should have been conditioned upon various provisions protecting their interests. The Regos also contend that the court erred in providing for a $15,000 money judgment against them if they failed to pave the premises of the service station.

## UNCERTAINTY OF THE TERMS OF THE CONTRACT

In this appeal the Regos argue that specific performance should have been denied because the terms of the purchase option were uncertain.[1] In their view the uncertainty of the option is reflected in the provisions pertaining to the amount of monthly payments, the lack of definition concerning the phrase "net profit" on diesel fuel sales, the omission of any provision for interest and stipulated time for its payment, and the further omission of any

---

1. This contention was not squarely advanced by appellants at the trial court level. The main thrust of their defense was that the contract should be reformed on the grounds that the purchase option agreement did not include all the terms which were agreed upon by the parties. It was further contended that this omission was due to a mistake.

security for Decker's performance. Decker argues that monthly payments under the purchase option clearly were to continue at $125 plus 2 cents per gallon on gasoline sold in excess of 4,000 gallons and net profit on diesel fuel; "net profits" on diesel fuel need not be certain because no diesel fuel has been or is likely to be sold; extrinsic evidence indicated that the parties intended no interest payments or security agreement.

■ To be specifically enforceable, a contract "must be reasonably definite and certain as to its terms."[2] In Alaska Creamery Products, Inc. v. Wells,[3] a contract for sale of goods was held too uncertain because the amount of the down payment and the terms of future payments were left for future determination by the parties. The inadequate contract in *Alaska Creamery* was an oral attempt to enter into an executory accord. Lewis v. Lockhart[4] reiterates the *Alaska Creamery* rule,[5] but finds adequate certainty for specific performance of a promise to sell land on the strength of a lessee's option to purchase on terms to be agreed on at the time of exercise, plus an "earnest money receipt" acknowledging part payment of the purchase price and reciting that the balance was to be obtained "from an FHA secured loan." *Lewis* said that the earnest money receipt cured the uncertainty of the option as drafted in the lease because the trial court could reasonably provide for payment within four months on the basis of the common knowledge that FHA loans generally were processed within that period.

Regarding the rule requiring reasonable certainty and its application to particular factual situations, *Alaska Creamery* and *Lewis* demonstrate that:

The dream of a mechanical justice is recognized for what it is—only a dream and not even a rosy or desirable one.[6]

■ In general it has been said that the primary underlying purpose of the law of contracts is the attempted "realization of reasonable expectations that have been induced by the making of a promise."[7] In light of this underlying purpose, two general considerations become relevant to solution of reasonable certainty-specific performance problems. On the one hand, courts should fill gaps in contracts to ensure fairness where the reasonable expectations of the parties are fairly clear. The parties to a contract often cannot negotiate and draft solutions to all the problems which may arise. Except in transactions involving very large amounts of money or adhesion contracts to be imposed on many parties, contracts tend to be skeletal, because the amount of time and money needed to produce a more complete contract would be disproportionate to the value of the transaction to the parties. Courts would impose too great a burden on the business community if the standards of certainty were set too high.[8] On the other hand, the courts should not impose on a party any performance to which he did not and probably would not have agreed. Where the character of a gap in an agreement manifests failure to reach an agreement rather than a sketchy agreement, or where gaps cannot be filled

---

2. Alaska Creamery Products, Inc. v. Wells, 373 P.2d 505, 510 (Alaska 1962).

3. *Id.*

4. 379 P.2d 618 (Alaska 1963).

5. *Id.* at 622.

6. 5A A. Corbin, Contracts § 1136, at 94 (1964).

7. 1 A. Corbin, Contracts § 1, at 2 (1963).

8. Restatement of Contracts § 370, comment c (1932) says that "[a]pparent difficulties of enforcement due to uncertainty of expression may disappear in the light of courageous common sense"; 5A A. Corbin, Contracts § 1174, at 283 (1964) (footnote omitted), says:

Apparent difficulties of enforcement that arise out of uncertainties in expression often disappear in the light of courageous common sense and reasonable implications of fact.

with confidence that the reasonable expectations of the parties are being fulfilled, then specific enforcement should be denied for lack of reasonable certainty.[9]

Several other considerations affect the standard of certainty. A greater degree of certainty is required for specific performance than for damages, because of the difficulty of framing a decree specifying the performance required, as compared with the relative facility with which a breach may be perceived for purposes of awarding damages.[10] Less certainty is required where the party seeking specific performance has substantially shifted his position in reliance on the supposed contract, than where the contract is wholly unperformed on both sides.[11] While option contracts for the sale of land such as the one at issue are not technically within the scope of the Uniform Commercial Code,[12] we consider relevant here the recent legislative decision to provide in contracts for sale of goods that

> [e]ven though one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.[13]

We turn now to consideration of the Regos' specific claims of uncertainty. Appellants' first three claims of uncertainty are that the monthly minimum payment after 1970 was not clearly established, that the meaning of "net profit" on diesel fuel sales was unclear, and that the option did not clearly establish whether interest was to be due on the unpaid balance. Appellants further argue that the agreement was fatally uncertain because it failed to say what sort of security, if any, was required while appellee was paying for the gas station. Our disposition on the issue of security obviates the necessity for passing on appellants' first three contentions.

Normal business practice, appellants contend, would require a real estate contract, deed of trust, or mortgage, but here the purchase option agreement is too uncertain to determine what security provisions should be put into a decree. Appellee Decker argues that the parties intended that there should be no security agreement, so the contract is not uncertain. The trial court did not make a finding of fact on the question of whether security was intended. If the parties intended not to provide for security, then the silence of the contract does not amount to uncertainty. A finding by the trial court that the parties intended to have a security agreement but failed to specify its character would have amounted to uncertainty in the contract in question. Such uncertainty, however, should not result in unconditional denial of specific performance, at least where the vendee has entered into possession in part in reliance on the option to purchase agreement. But as we hold below, in the circumstances of this case, specific performance on the Regos' part should not have been required without conditioning such performance on the giving of security by Decker for his performance. In granting specific performance, the decree can be fashioned to provide that the plaintiff furnish adequate security for his agreed performance.[14] In so doing, the courts are fulfilling their function of achieving justice between the parties with-

9. See, e. g., Ansorge v. Kane, 244 N.Y. 395, 155 N.E. 683 (1927); Blanchard v. Detroit, Lansing & Lake Mich. R. Co., 31 Mich. 43 (1875); 5A A. Corbin, Contracts § 1174, at 293 (1964).

10. 11 W. Jaeger, Williston on Contracts § 1424 (3d ed. 1968); Restatement of Contracts § 369 (1932), comments b and c.

11. Young v. Nelson, 121 Wash. 285, 209 P. 515 (1922), (lessee wins specific performance of option to renew a five year lease), criticized in Note, Specific Performance of Incomplete Agreements, 36 Harv.L.Rev. 726, 729 (1923).

12. AS 45.05.038; AS 45.05.044(a).

13. AS 45.05.056(c).

14. 5A A. Corbin, Contracts § 1137, at 98, 101 (1964); see City of La Follette v. La Follette Water, Light & Telephone Co., 252 F. 762 (6th Cir. 1918).

out requiring additional or unnecessary litigation.[15]

## HARDSHIP AND SPECIFIC ENFORCEMENT

The Regos argue that specific enforcement should have been denied because the terms of the purchase option agreement, as interpreted by the court, imposed on them excessive hardship. This argument has three central themes: first, the portion of the option agreement which set the monthly payments was made part of the option agreement without their awareness; second, the monthly payments are too low; third, appellee Decker's performance is unsecured and will be difficult to enforce. Our decision on security obviates the need to discuss the first two points.

The lack of security for Decker's continuing obligation raises an issue of hardship. The Regos argue that the decree rendered by the court below compels them to perform without any security for Decker's performance. They contend that their remedy of in personam suits against appellee would be too burdensome and uncertain, especially in view of the long period over which payments may extend and the contingency that Decker may avoid payments of two cents per gallon on gasoline sales and net profits on diesel fuel by ceasing to operate the premises as a gas station or transferring them to one who ceases so to operate them. If only the minimum monthly payments fall due, Decker's obligation may last more than 50 years.

Though the Regos argue this issue mostly in terms of hardship, its traditional classification falls within the doctrine of mutuality of remedy. The ancient formulations of that doctrine have been persuasively criticized and widely repudiated.[16] The doctrine has been reformulated in more sensible terms in recent decades. As expressed in the Restatement, the rule, called a requirement of security that the agreed exchange will be rendered rather than "mutuality", is that

> [s]pecific enforcement may properly be refused if a substantial part of the agreed exchange for the performance to be compelled is as yet unperformed and its concurrent or future performance is not well secured to the satisfaction of the court.[17]

The comment to this section of the Restatement of Contracts says in part that:

> If the defendant is compelled to perform specifically, the plaintiff is expected to do the same * * *. It may, indeed, be said that where the contract provides for performance by the defendant before the return performance by the plaintiff, the defendant consciously assumes the risk of nonperformance by the plaintiff that is involved in those facts. But after a controversy has arisen and litigation is begun, that risk may be considerably increased. There is no injustice to the plaintiff in requiring the reduction of that risk, as the price of getting so drastic a remedy.[18]

We believe this comment pertinent to the situation in the case at bar. The risk of Decker's nonperformance of his side of the purchase option agreement is most likely greater now that controversy and litigation have arisen, so reduction of that risk may justly be required as a condition of obtaining specific performance.

Given the existing uncertainty as to the security for Decker's performance, the prospect of a potential 50 year purchase price payout, and the fact that Decker's performance is unsecured, we hold that the superior court's decree requiring specific performance from the Regos should have been fashioned to reduce, or minimize,

---

15. Tayloe v. Merchants' Fire Ins. Co. of Baltimore, 50 U.S. 390, 405, 13 L.Ed. 187, 193 (1850).

16. 5A A. Corbin, Contracts §§ 1178–1182 (1964); 11 W. Jaeger, Williston on Contracts § 1433 (3d ed. 1968); Restatement of Contracts § 372 (1932).

17. Restatement of Contracts § 373 (1932).

18. *Id.* at comment *a.*

the impact of these factors. One alternative available to the trial court is to condition the grant of specific performance upon immediate payment in full of the purchase option purchase price.[19] On the other hand, the trial court could, in its discretion, as a condition to granting specific performance, require Decker to provide the Regos with adequate security for his performance, the court determining the appropriate term and provisions of such security. Analysis of the transaction here suggests that the base rent was set lower for 1966, 1967, and 1968 than for 1969 and 1970, because the revenues from the service station were expected to be lower in those early years, before construction of the anticipated new highway to Anchorage, new road to the University, and new apartments and shopping center near the service station's location. Apparently the Regos entered into the purchase option agreement in anticipation of a boom in gasoline and diesel fuel sales.[20] These expectations never materialized.[21] On remand if payment of the purchase price in full is found inappropriate then evidence should be received as to the parties' expectations concerning the amounts which were anticipated as monthly gasoline royalties and profits from diesel fuel sales, as well as evidence of the monthly sales of such items from comparable service station locations in the Fairbanks area. The trial court should then be in a position to determine a fair period over which the purchase price is to be paid in installments, as well as appropriate terms to secure these payments.[22]

Thus, although we believe the trial court was correct in granting Decker specific performance of the purchase option agreement, we further hold that the court's decree should have been made conditional upon Decker's either paying the purchase price in full or furnishing adequate security embodying such terms as the court considered appropriate. We therefore affirm the decree insofar as it awards Decker specific performance and the case is remanded for such further proceedings as are deemed necessary to condition the grant

19. Morris v. Ballard, 56 App.D.C. 383, 16 F.2d 175 (1926); 11 W. Jaeger, Williston on Contracts § 1424, at 817–18 (3d ed. 1968); Restatement of Contracts § 370, illustration 1 (1932). In 5A A. Corbin, Contracts § 1174, at 284–85 (1964), it is stated that:

> If the only uncertainty is as to the period of credit to be allowed, the right to interest not being involved, the vendee may surmount the difficulty and entitle himself to specific performance by asking no credit whatever and offering to pay the whole amount in cash.

20. At the time of trial the Regos had not received any profits from the sale of diesel fuel and Decker had never sold more than 4,000 gallons of gasoline in any one month.

21. While change of circumstances may sometimes create hardship requiring refusal of specific enforcement, the mere continuance of a poor business climate within the reasonable contemplation of the parties, the risk of which was intentionally imposed by the contract on the vendor, does not justify denial of specific performance.

> 5A A. Corbin, Contracts § 1162, at 207–09 (1964); 11 W. Jaeger, Williston on Contracts § 1428 (3d ed. 1968). This comment on the history of percentage leases casts light on the contract at issue:

> The percentage lease received its greatest development because of the inability of the fixed-rental mercantile lease to meet extreme fluctuations in business conditions. This was forcefully demonstrated by the multitude of lease renegotiations in the early thirties. The tenants could afford only low rentals until business improved, yet wanted security of occupancy which a short fixed lease would not provide. The lessors, on the other hand, expecting the depression to pass quickly, did not want to be saddled with a long-term, low-rental agreement.

> Note, The Percentage Lease-Its Functions and Drafting Problems, 61 Harv.L.Rev. 317 (1948) (footnote omitted). The Regos' position may be compared to that of an overly optimistic 1930 percentage lessor.

22. See generally 5A A. Corbin, Contracts § 1137 (1964). At the trial no evidence was adduced as to the sales of such products at comparable locations nor were specific amounts testified to by the parties themselves.

of specific performance upon the giving of appropriate security.

## THE EVIDENCE WITH RESPECT TO PAVING COSTS

The judgment below required the Regos to pave the grounds of the service station with asphalt by July 15, 1969, or suffer a judgment for damages of $15,000. The only evidence supporting the $15,000 damages judgment was testimony of Decker received over the Regos' objection, that he had inquired of Paving Products of Fairbanks, and they had told him that the cost of paving would be "approximately" $15,000. This statement was apparently an opinion as to the probable cost rather than an offer to pave the premises for $15,000. The Regos argue that the $15,000 figure was inadmissible because it was hearsay, and because it was an expert opinion offered without proper foundation, and that Decker's use of the word "approximately," made the damages too uncertain to be awarded. Decker counters that under Supreme Court Rule 11(a) (6), this matter is not properly at issue because the Regos' specification of errors failed adequately to set forth the relevant portions of the record. On the merits, Decker argues that the statement was admissible because an owner of property may testify as to its value and also that because the superior court gave the Regos the alternative of paving the premises instead of paying the damages, any error in the amount of damages was harmless.

■ The Regos should have complied with Supreme Court Rule 11(a) (6). Their failure to do so, however, did not waste the court's time or prejudice Decker's right

to know what points he had to meet,[23] because the first paragraph of the Regos' argument made the specification concrete. Strict enforcement of the rule, therefore, would in this case work injustice and we relax the requirement.[24]

■ The statement at issue put the opinion as to cost of paving of some unnamed person not a witness into evidence for purposes of proving the cost of paving. It was therefore hearsay; the Regos were entitled to keep the opinion out unless its author was sworn and subject to confrontation and cross-examination.[25] Decker's point that the owner of property may testify as to its value lacks relevance, since the statement at issue was not a statement as to the value of the property, and since that principle bears on competency of witnesses rather than the hearsay rule.[26] The error does not appear to have been harmless;[27] Decker argues that the Regos would have avoided any prejudice by having the paving done at their own expense if the cost was less than $15,000, but the Regos might have been unable to do this because of lack of adequate cash between February 1969, when the judgment was entered, and July 15, 1969, when their time for performance in lieu of damages ran out. Nothing else in the record supported the figure of $15,000 as damages.

Since we have decided that a remand is necessary for further proceedings to determine appropriate security for Decker's performance, we believe that the paving-damages aspect of the case should also be remanded in order to permit the parties to bring forth competent evidence as to the costs of paving the grounds of the service station with asphalt.

Affirmed in part, remanded in part.

23. Parks v. Brown, 368 P.2d 200, 223 (Alaska 1962).

24. Supreme Ct.R. 52.

25. Meyst v. East Fifth Ave. Serv., Inc., 401 P.2d 430, 437 n. 15 (Alaska 1965).

26. 3 J. Wigmore, Evidence § 714, at 45 (3d ed. 1940); 29 Am.Jur.2d Evidence § 402 (1967).

27. Civ.R. 61.